UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

EDWARD SULLIVAN, III,

    Plaintiff,

v.                                                   Case No. 8:20-CV-2156-MAP

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.
_____/

**ORDER**

This is an appeal of the administrative denial of disability insurance benefits (DIB) and period of disability benefits.[1] *See* 42 U.S.C. § 405(g). Plaintiff argues the administrative law judge (ALJ) erred by discounting Plaintiff's subjective complaints of disabling pain. After considering the parties' arguments (Doc. 18) and the administrative record (Doc. 12), I find the Commissioner's decision is supported by substantial evidence. I affirm.

    A.     *Background*

Plaintiff Edward Sullivan, III was born on January 27, 1967, and was 45 years old on his alleged disability onset date (AOD) of June 12, 2012. (R. 40) His date of last insured (DLI) for DIB is March 31, 2015; Plaintiff must show he became disabled by his DLI to receive benefits. (R. 18) Plaintiff alleges he became disabled following two car accidents that injured the left side of his body. The second, more serious accident was a passenger side collision with a drunk driver that occurred when Plaintiff was on vacation in Boston in January 2012 (about six months before his onset date). (R. 49, 59) Plaintiff suffered an injured

---

[1] The parties have consented to my jurisdiction. *See* 28 U.S.C. § 636(c).

1

left knee, left shoulder, neck, and back. (R. 49-50) He also experiences headaches related to his injuries and finds it hard to concentrate on tasks. (R. 64) He had successful arthroscopic surgery on his left knee. In his words, "The left knee healed well . . . . I don't have any issues with my left knee." (R. 50) His left shoulder pops out of joint so even though he is left handed, he favors his right arm. (R. 51) He received nerve block injections for his lower back pain and testified, "my lower back right now, I can live with my lower back. My back is fine. It's just my neck and my shoulder." (R. 52) Plaintiff struggles to lift anything over 10 pounds and cannot lift his left arm above his head without experiencing sharp pain and numbness. (R. 54)

Plaintiff has a Bachelor of Science degree in business and psychology, and before his AOD he worked staging promotional events and advertising for banks. (R. 41) He moved up in his industry and, in 2000, started Trendline Marketing, Inc., a marketing company that contracted with large financial institutions to organize credit card promotions. (R. 41-42) He served as company president and traveled nationwide to manage in-person events at venues like sports arenas and convention centers. At the height of his business, he employed approximately 3,000 people. (R. 43-45) But when the financial crisis hit the banking industry in 2007, Plaintiff's contracts disappeared almost overnight. According to Plaintiff, "I lost every contract." (R. 42) He testified he "had to dissolve the business and reconcile with, I had like 2000 employees across the country . . . I had to reconcile my, my company. It was really a shock. They just came in and cut everything right off." (*Id*.) He laid off all his employees and wound down his business.

Plaintiff's change in circumstances had an upside: it allowed him to spend more time at home with his family after traveling for his job for 18 years. (R. 58) He testified that his daughter was born with a brain injury and is paraplegic. (R. 46-47) At the time of the hearing,

2

she was 17 years old. She cannot see, hear, walk, or talk, and Plaintiff, his ex-wife, extended family members, and home health nurses provide around the clock care for her. (R. 47, 54-55) Before Plaintiff's car accident in 2012, he testified he would pick her up to change and bathe her. (R. 48) But now he relies on handicap-assistance technology to hoist his daughter from her wheelchair to a couch or bed, and he has a wheelchair accessible vehicle.

Plaintiff explained that his family obtained a settlement related to his daughter's birth they put into a trust for her care. (R. 47) Leading up to Plaintiff's onset date, Plaintiff was reimbursed from the trust for his time and money spent caring for his daughter. (R. 37) Plaintiff reported this money as earnings; the ALJ considered Plaintiff's work as his daughter's companion to be past relevant work.[2] (R. 36-39, 22)

After a February 4, 2020 administrative hearing, the ALJ found that Plaintiff had the severe impairments of degenerative disc disease (DDD) of the lumbar and cervical spine, left knee strain, and left shoulder disorder. (R. 18) The ALJ found that during the period at issue (Plaintiff's AOD of June 12, 2012, through his DLI of March 31, 2015) Plaintiff retained the residual functional capacity (RFC) for light work with these exceptions:

> no more than occasional climbing, balancing, stooping, kneeling, crouching, and crawling; but never climb ladders, scaffolds, ropes, or at open, unprotected heights. Standing and/or walking was about six hours total, as well as sitting for about six hours in an eight-hour workday, all positions considering the usual breaks. He was required to avoid extreme vibrations and was limited to occasional overhead reaching with the left upper extremity.

(R. 18-19) After consulting a vocational expert (VE), who testified, the ALJ found Plaintiff was not disabled and could return to his past relevant work as a sales service promotor and a

---

[2] Plaintiff's 2011 and 2012 earnings records listed $24,000 and $26,000 in self-employment, respectively. Plaintiff testified that his accountant mistakenly reported these amounts as earnings, but they were really reimbursements from the trust for his daughter's care. (R. 37-38, 46-47)

3

companion and could also work as an office helper, a cashier, or an information clerk. (R. 22-24)  Plaintiff appealed the ALJ's decision to the AC, which denied review. (R. 1-4)  His administrative remedies exhausted, Plaintiff filed this action.

  *B.*  *Standard of Review*

  To be entitled to DIB, a claimant must be unable to engage "in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *See* 42 U.S.C. § 423(d)(1)(A).  A "'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  *See* 42 U.S.C. § 423(d)(3).

  The Social Security Administration, to regularize the adjudicative process, promulgated detailed regulations.  These regulations establish a "sequential evaluation process" to determine if a claimant is disabled.  *See* 20 C.F.R. § 404.1520.  If an individual is found disabled at any point in the sequential review, further inquiry is unnecessary. 20 C.F.R. § 404.1520(a)(4).  Under this process, the Commissioner must determine, in sequence: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment(s) (*i.e.*, one that significantly limits his ability to perform work-related functions); (3) whether the severe impairment meets or equals the medical criteria of Appendix 1, 20 C.F.R. Part 404, Subpart P; (4) considering the Commissioner's determination of claimant's RFC, whether the claimant can perform his past relevant work; and (5) if the claimant cannot perform the tasks required of his prior work, the ALJ must decide if the claimant can do other work in the national economy in view of his RFC, age,

education, and work experience.  20 C.F.R. § 404.1520(a)(4).  A claimant is entitled to benefits only if unable to perform other work.  *See Bowen v. Yuckert*, 482 U.S. 137, 142 (1987); 20 C.F.R. § 404.1520(f), (g).

In reviewing the ALJ's findings, this Court must ask if substantial evidence supports those findings.  *See* 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  The ALJ's factual findings are conclusive if "substantial evidence consisting of relevant evidence as a reasonable person would accept as adequate to support a conclusion exists."  *Keeton v. Dep't of Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citation and quotations omitted).  The Court may not reweigh the evidence or substitute its own judgment for that of the ALJ even if it finds the evidence preponderates against the ALJ's decision.  *See Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).  The Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining the proper legal analysis has been conducted mandates reversal."  *Keeton*, 21 F.3d at 1066 (citations omitted).

    C.    Discussion

        1.    *ALJ's consideration of Plaintiff's subjective pain complaints*

Plaintiff's first and only contention is that the ALJ's consideration of his back and neck pain, headaches, panic attacks, and difficulty concentrating on tasks ran afoul of the Eleventh Circuit's pain standard (Doc. 18 at 8-11).  The Eleventh Circuit has crafted a pain standard to apply to claimants who attempt to establish disability through their own testimony of subjective complaints.  The standard requires evidence of an underlying medical condition and either (1) objective medical evidence that confirms the severity of the alleged pain arising from that condition, or (2) that the objectively determined medical condition is of such a

severity that it can reasonably be expected to give rise to the alleged pain. *See Holt v. Sullivan*, 921 F.2d 1221 (11th Cir. 1991). When the ALJ decides not to credit a claimant's testimony as to his pain, he must articulate explicit and adequate reasons. *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995).

Social Security Ruling 16-3p cautions that "subjective symptom evaluation is not an examination of an individual's character." *Id.* Adjudicators, as the regulations dictate (*i.e.*, 20 C.F.R. § 404.1529), are to consider all the claimant's symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the record. *Id.* The regulations define "objective evidence" to include medical signs shown by medically acceptable clinical diagnostic techniques or laboratory findings. 20 C.F.R. § 404.1529. "Other evidence," again as the regulations define, includes evidence from medical sources, medical history, and statements about treatment the claimant has received. *See* 20 C.F.R. § 404.1513(b)(2)-(6). Subjective complaint evaluations are the province of the ALJ. *Mitchell v. Comm'r of Soc. Sec.,* 771 F.3d 780, 782 (11th Cir. 2014).

Here, the ALJ relied on largely boilerplate language in assessing Plaintiff's subjective pain complaints:

> After careful consideration of the evidence, the undersigned finds claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(R. 19)  This language directly addresses the Eleventh Circuit's pain standard and is not improper *if* supported by substantial evidence.  *See Danan v. Colvin*, 8:12-cv-7-T-27TGW, 2013 WL 1694856, at * 3 (M.D. Fla. Mar. 15, 2013).

Here, it is.  The ALJ summarized Plaintiff's complaints: "[T]he claimant alleged that he became unable to work due to pain in his neck, back, and knee, and rotator cuff issues in his shoulder (Ex. 6E). . . .  He also reported constant pain and having some difficulty with some of his activities of daily living." (R. 19)  Later in his opinion, the ALJ continued: "[T]he claimant's allegations regarding his activities of daily living are not credible, as no treating source advised him to stay home all day, lie down throughout the day, elevate lower extremities, or restrict his movement in any manner.  Furthermore, he was not advised to refrain from performing all gainful work activity." (R. 21)

Plaintiff testified that after his 2012 accident, he could not lift his daughter anymore. (R. 48)  He can "barely move" his left arm. (R. 52)  "They give me the shots and they give me the medicine and it's just at the point where, I don't know if it's ever going to get better. . . . I do some PT with it and try to strengthen it.  But literally all day my left arm is, is a problem." (R. 54)  But Plaintiff also testified his left knee healed well after surgery (R. 50) and his "back is fine" after shots. (R. 52)  His main source of pain is "just my neck and my shoulder." (R. 52)

According to Plaintiff he cannot care for his daughter anymore, he relies on help from his ex-wife and a home health nurse:  "I have arrangements where she gets wheeled into my vehicle, she gets wheeled out of my vehicle.  And then I have a Hoyer lift and I have certain things that take her out of the two-wheel chair and put her into wherever she's going, whether it's her bed or the couch." (R. 54-55)  At his house he has "all handicap accessible items in

my home and I have a nurse aide a couple of hours each day and Mom oversees me, basically, to help me." (R. 55)  Plaintiff estimates he can walk about four blocks and sit for up to 45 minutes at a time. (R. 55-56)  He takes breaks from caring for his daughter throughout the day to elevate his legs, and he suffers from headaches and loss of concentration. (R. 67-68)

Regarding his pain level, he testified, "it's just constant chaos with the pain and I, the medications, and I try to get off the medications and just the revolving door.  And every day's just, I'm at the point now where I just set up and infrastructure where every – . . . I just have a system now.  I don't do much and I just do what I can." (R. 68)  He feels like his family cares for him "like a baby" (R. 61) and he "can't do what I used to do and that's hard, but it's what it is." (R. 69)

But Plaintiff's medical records do not tell the story of someone with disabling pain.  First, Plaintiff did not report difficulties focusing or concentrating to any examining or treating sources during the relevant time.  Although he took medication to treat his anxiety, his mental health treatment consisted of medication management. (R. 515-17, 557-58)  Regarding Plaintiff's physical impairments, before his DLI he received generally conservative treatment.  A post-accident, August 2012 lumbar spine MRI showed a mild annular bulge with a right lateral disc protrusion at the L5/5 level and a significant degenerative bulge at the L5/S1 level "causing some mild impression upon the left central S1 nerve as well as bilateral neural foraminal stenosis, worse on the right." (R. 456)  He had mild disc bulging at L3/4. (*Id.*)

A cervical spine MRI later that month revealed disc protrusions at the C3/4 and C4/5 levels, broad disc bulges superimposed at the C3/4, C4/5, and C5/6 levels, with bilateral foraminal stenosis at the C3/4 and C5/6 levels. (R. 458)  In September 2012, orthopedist

Kevin Scott, M.D. of Westchase Orthopedics evaluated Plaintiff. (R. 464) Plaintiff had 4/5 strength in his left leg, and Dr. Scott diagnosed him with a left knee strain and directed him to increase his gym workouts slowly to strengthen his quadriceps and knee. (*Id.*)

Six months later, in February 2013, Plaintiff treated with orthopedic surgeon Gary Moskovitz, M.D. for neck and lower back pain. (R. 475) Dr. Moskovitz observed that Plaintiff had mildly decreased range of motion in his cervical and lumbar spine and opined that the accident had re-aggravated Plaintiff's pre-existing lumbar spine issues and that he also had disc herniation at C3/4 and C4/5. But the doctor recommended that Plaintiff continue with conservative care. (*Id.*) If Plaintiff's symptoms persisted, Dr. Moskovitz stated, "he may elect to undergo operative intervention on his neck in the form of C3-4 and C4-5 anterior cervical discectomies and fusion." (*Id.*) According to Plaintiff's testimony, he did not choose the surgical option, and he experienced improvement with injections. (R. 51-52)

Over 18 months later, in September 2014, Plaintiff went to the Tampa Outpatient Surgical Facility, where treatment notes indicate Plaintiff had "cervical facet joint mediated mechanically generated neck pain, and cervical radiculopathy of the left upper extremity." (R. 492) Joseph Rashkin, M.D. administered a cervical epidural nerve block injection and a bilateral cervical facet joint nerve block injection (his only injections that pre-date his March 2015 DLI). (R. 493) From December 2014 through Plaintiff's DLI, Dr. Rashkin provided him with medication management – Norco for back pain, Alprazolam and Xanax for anxiety, and muscle relaxant Soma – but the doctor did not record detailed examination findings. (R. 515-17, 557-58) After Plaintiff's DLI, Dr. Rashkin's notes were more thorough, and he consistently found Plaintiff was "generally healthy" with decreased range of motion of his cervical spine (worse with activities) and constant dull, radiating neck pain. (R. 519-20, 525-

26, 531-32, 537-38, 543, 548-49, 554, 559, 566-67, 592-93, 598-99, 604-05, 610, 615-16) He continued Plaintiff on medication management and, in December 2018 and again in June and July 2019, Dr. Rashkin added nerve block injections to Plaintiff's treatment. (R. 623-77)

On this record, the ALJ's consideration of Plaintiff's subjective complaints of pain is supported by substantial evidence. I emphasize that, to the extent Plaintiff asks me to re-weigh the evidence or substitute my opinion for that of the ALJ, I cannot. If the ALJ's findings are based on the correct legal standards and are supported by substantial evidence – as they are here – the Commissioner's decision must be affirmed even if I would have reached a different conclusion. *See Bloodsworth*, 703 F.2d at 1239. "And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, ___ U.S. ___; 139 S.Ct. 1148, 1154 (2019). I may not reweigh the evidence or substitute my own judgment for that of the ALJ even if I find the evidence preponderates against the ALJ's decision. *See Bloodsworth*, 703 F.2d at 1239. On this record, the ALJ did not err in considering Plaintiff's complaints of pain limited him to light work.

D. *Conclusion*

It is ORDERED:

(1) The ALJ's decision is AFFIRMED; and

(2) The Clerk of Court is directed to enter judgment for Defendant and close the case.

DONE and ORDERED in Tampa, Florida on January 14, 2022.

*[signature: Mark A. Pizzo]*
MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE